Lindsay

*v.*

Stover's Ex'r.

(*Supreme Court of Appeals of Virginia, September 20, 1873.*)

**Sale of Land—Confederate Contracts.**

All sales of property made at as late a period of the war as 1863 are taken to be made for Confederate currency, unless the terms of the sale are plainly for a different currency.

**Same—Same—Scaling.**

A case in which the debt was scaled according to the property value.

Appeal from the circuit court of Augusta county.

*Fultz*, for appellant.

*Thomas J. Michie*, for appellee.

Anderson, J., delivered the opinion of the court.

It was held by this court in Walker's Ex'or et als. v. Paige et als., 21 Gratt. 642, "that all the decrees by the courts of this commonwealth, for the sale of property, at as late a period of the war as 1863, and all judicial sales, made under such decrees, must be taken to be rendered and made for the currency which then constituted the only circulating medium of the country, unless such decree, in plain terms, directed otherwise." By a parity of reasoning, all sales of property, made at so late a period of the war, must be taken to have been made for such currency,

unless the terms of the sale were plainly for a different currency. The bond upon which this suit was brought was executed on the 2nd day of November, 1863, for a part of the purchase money of a tract of $41\frac{3}{4}$ acres of land, which was sold on that day, to the plaintiff in error, by the executor of Simon Stover. By the Acts of Assembly of the 14th of September, and the 14th of October, 1863, it was *prima facie* a contract to pay in Confederate money. And this presumption is confirmed by the price agreed to be paid for the land. Upon this presentation of the case, it is clear that no further or other proof was necessary to show that it was a Confederate contract, and that the defendant in the court below was entitled to have the debt scaled either by the gold or property standard.

' But it is contended for the defendant in error, that the evidence in the record is sufficient to rebut that presumption, and shows an express agreement to pay the deferred installments, which did not mature until after the termination of the war, in United States currency, now nearly equal to gold. If such is proved, it is by the testimony of the plaintiff in the court below, who was introduced as a witness by the defendant himself, and is the only witness. It is strange that the defendant, who could with perfect safety, have rested his case without introducing any witness, should have introduced a witness whose testimony would be directly in the teeth of his defence. It is hardly probable that a party will introduce a witness to testify point blank against him, if he knew that he would so testify. And if such was the contract between these parties, the defendant must have known it, and he must have known that the plaintiff, whose interest would be directly promoted by it, would not fail to testify to it. The fact of the defendant's introducing him as a witness, even when his testimony, in any respect, was not *necessary* to his defence, is a powerful circumstance to

show that there was no such agreement or understanding between them. And if he swears that there was, it tends strongly to his discredit, as does also his conduct, in receiving payment of $4,700.00 in Confederate currency, then so greatly depreciated, when he was bound to receive at that time in Confederate money only $2,783.33—one-third of the purchase money—when by waiting a little while, if such was his contract, and especially if the view is correct that everybody at that time had given up the Confederacy, or at heart believed it probable that it would be speedily overturned and that greenbacks would become our currency, he would receive payment in good money, now almost equal to gold. I repeat, that if he swore that he was to be paid in greenbacks in such an amount, then circumstances tend very strongly, if not conclusively, to discredit his testimony, and a jury, and the court exercising the province in this case of both judge and jury, would have been warranted to reject it. And it would have been no ground for setting aside the verdict in the one case or recovering the judgment in the other. Indeed the credibility of the witness being in question, which may be discredited by circumstances as well as by direct impeachment, as in Patterson v. Lord, it would not be a case proper for a certificate, and a bill of exceptions could not be well taken.

But it is a mistake to say that the executor testified that such was the contract. He does not testify that proclamation was made on the day of sale that the sale would be for currency such as might be afloat when the bonds matured or fell due. After stating the terms of sale, one-third in hand, and the balance in three, or five, at the option of the purchaser, equal annual payments, he says that the terms of sale were proclaimed by the owner. And the certificate goes on to state, that "it was admitted by the owner (the executor of Stover) that the sale was for currency such as might be afloat

when the bonds matured and fell due." He does not say that proclamation was made to this effect, but says he told it to persons who were at the sale. The certificate states that it was admitted by the executor that the sale was for such currency. But it does not say that it was admitted by the purchaser, the defendant. There's the rub. And the executor says he announced it to persons at the sale, but he does not pretend to say that he announced it to the defendant. He says some persons, of course those to whom he announced it, were deterred from bidding at the sale. And if he had announced it to the defendant, or intimated to him that in any event it was to be paid for in gold, or in a currency now nearly equal to it, he too would have been deterred from bidding. At least it is very clear to my mind that he would not have bid $200 an acre for land, proved only to be worth before the war $38.00 an acre. And this is the evidence to prove an express agreement to pay upon the event happening, which has occurred, in United States currency, in contravention of the inevitable inference of fact and presumption of law that the true understanding and agreement was to pay in Confederate currency, and that the contract was made with reference to that currency as the standard of value. I hold that the evidence is wholly insufficient to prove such an agreement in the face of such overwhelming circumstances to the contrary, and if the witness had sworn to such an agreement, as is claimed, his own conduct and the act of the defendant in introducing him as a witness, in connection with the whole comprehension of the case, would discredit him.

A tract of 41¾ acres of land worth $38.00 an acre before the war, in the aggregate $1,586.50, was sold on the 2nd of November, 1863, for $200.00 an acre—in the whole for $8,350.00, of which $4,700.00 was paid in Confederate money, and for the balance which is $3,650.00 four bonds were executed, of which the one in suit for $891.66⅔ is one

It does not appear that either of them is paid.    For a tract of land worth a little more than $1,500.00 the plaintiff in error was paid in Confederate money $4,700.00, and it is insisted by the vendor that he is bound by his contract to pay the additional sum of $3,650.00 with interest in United States currency, nearly equal to gold.    If such was the contract, it is one of extreme hardship which the courts would feel reluctant, though they might feel bound, to enforce.    But if such was not the plaintiff in error's contract—if he did not assume such an obligation by his contract,—it is not only an extreme hardship, but a flagrant injustice to require it of him.

I am unwilling to hold parties bound to pay in United States currency, dollar for dollar, for property purchased during the war at Confederate prices and when Confederate money was the only currency in the country, unless the evidence clearly shows that it was in the contemplation of the parties when they made the contract, and was their intention, that in some contingency, payment should be made in that currency.    And I cannot agree that the state of our affairs was such that in November, 1863, as to make the general impression on the minds of our people that the Confederacy would be overturned, and the government of the United States re-established.    And even if now to look back, we must admit that the condition of things was not such as to justify such an apprehension.    I do not believe that such an apprehension then existed amongst our people, to any great extent.    On the contrary I believe the general and prevailing sentiment was that we could under no circumstances surrender our independence and place our liberty at the mercy of an ungenerous and malignant foe.    And not until after the surrender at Appomattox did our people give up the cause as lost or allow themselves to believe that eight millions of freemen could submit to subjugation.    It is true

1 Va Dec—3

that previous to that date our gallant armies had encountered several grievous defeats, but the whole power of our enemies, with the world to recruit their armies and to replenish their military stores, was for nearly eighteen months worsted after the date of this contract. And it was after this period that the most brilliant defensive campaign of the war was conducted by General Lee, from the battle of the Wilderness to Cold Harbor, which will ever illustrate the page of history, and a campaign which will enshrine the name of that noble chieftain with immortality. From the known temper and disposition of our people, down to the surrender of Appomattox, I do not think that, in making contracts with reference to Confederate currency as the standard of value, if those contracts have not matured until after the close of the war, it can be fairly presumed they intended or contemplated payment in the currency of the country with which we were then at war.

I am of opinion that the judge, who exercised the province of both judge and jury, having heard the evidence, could but decide what weight it was entitled to, and that the verdict ought not to be set aside, unless for a plain deviation from the evidence. But I think in this case it would be more just to have allowed the property valuation of the Confederate money, and as the evidence is not very satisfactory as to the gold value of the land, I am in favor of sending the case back, as we did in Salmon and Meredith for an account to ascertain its value, or to be submitted to the jury, if either party should desire it. I am therefore for reversing both judgments and remanding the cause to the circuit court, there to be proceeded in according to the principles herein stated.